Filed 6/29/20

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C088348 |
| Plaintiff and Respondent, | (Super. Ct. No. P18CRF0064) |
| v. | |
| ISIAH CAMPBELL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of El Dorado County, Mark A. Ralphs, Judge. Affirmed.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Isiah Campbell appeals from the judgment entered after a jury found him guilty of three counts of pimping (Pen. Code, § 266h, subd. (a))[1] and 11 counts of pandering (§ 266i, subd. (a)). He contends reversal is required for a variety of reasons, including improper venue, insufficient evidence, the pandering statute is void for vagueness, instructional error, ineffective assistance of counsel, and improper conviction on multiple counts of pimping. We reject defendant's contentions and shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

**Factual Background**

We summarize the relevant facts in the light most favorable to the jury's verdicts. (See *People v. Abilez* (2007) 41 Cal.4th 472, 504.) Additional information necessary to the resolution of this appeal is set forth below. For purposes of consistency and clarity, we refer, as the parties did in the trial court, to the alleged victims in this case as Jane Doe 1 through Jane Doe 12 (hereafter JD1, JD2, etc.; collectively Jane Does).

*JD1's Testimony*

JD1 is from Serbia. When she lived there, she occasionally had sex with men in exchange for money or favors, which was an acceptable and a common occurrence at the time.

Around 2008, JD1 immigrated to the United States. Thereafter, she married a man named Rade[2] and worked various jobs. At some point, she posted an advertisement on Backpage.com, a classified advertising Web site commonly used to advertise for prostitution activities, and had sex with men in exchange for money or favors "from time to time."

---

[1] Undesignated statutory references are to the Penal Code.

[2] Rade was also known as "Rocky."

2

In early 2014, JD1 met defendant online and they began exchanging messages. They met in person about a year later. Shortly thereafter, she became pregnant. At the time JD1 met defendant in person, she was living at a motel in Sacramento. Although JD1 and Rade never "formally separated," they had gone their "separate ways" by 2015.

Defendant was good with computers and came up with a plan in early 2015 to make money and travel by having JD1 engage in sex for money. As part of the arrangement, he took pictures of her, designed and posted advertisements for her on the Internet (e.g., Backpage.com), established the prices she charged for specific sexual acts, negotiated the "meet up" or "dates"[3] (which largely took place in hotel rooms), booked hotels for her, drove her around as necessary, and protected her. In return, she agreed to split her earnings with him equally.

Defendant set up dates for JD1 in Seattle and various cities in the Sacramento area, the San Francisco Bay Area, the Central Valley, and Southern California. During the dates, he would wait outside the hotel or somewhere nearby.

Defendant used fear and violence to dominate and control JD1. Following the birth of their daughter in December 2015, JD1's relationship with defendant changed for the worse. He became controlling and violent. He dictated when and where she would engage in prostitution activities and forced her to work all day, including shortly after giving birth. He decided where she lived and when she could see her daughter. He had sex with her against her will and occasionally beat her before they had sex. He also beat her if she failed to follow his directions or if she expressed her opinion. The beatings occurred frequently, about "every other day." On a few occasions, the beatings were "very bad, very, very bad."

---

[3] Defendant linked JD1's phone number to his Google Voice account, which allowed him to read and respond to any text message she received from a client, i.e., a person seeking to engage in sexual acts in exchange for money.

3

JD1 attempted to end her relationship with defendant several times. However, he would eventually find her and "bad things would happen," including an incident where he beat her and hit their daughter. In addition to his violent and controlling behavior, defendant decided to take a larger share of JD1's earnings. He took her bank card and withdrew money from her account without her permission to pay for his personal expenses and expenses related to other women with whom he was working. When she complained about how he was handling her earnings, he beat her.

JD1 worked with defendant until he was arrested in March 2017. During the time period she worked with defendant, he also worked with JD2, JD3, JD5, JD6, JD7, JD8, JD9, JD10, and JD11. Although JD1 never worked with JD4, she recognized JD4 from a photograph and noted that defendant had told her that he worked with JD4. When asked, JD1 explained that "working" for the women meant exchanging sex for money.

*The Sting Operation*

On March 16, 2017, detectives from the El Dorado County Sheriff's Department conducted an undercover human trafficking sting operation at the Best Western Motel in Placerville. After researching various Web sites, an undercover investigator set up a date with JD1 at the motel.

At 8:45 p.m., defendant dropped JD1 off at the motel. After she and the undercover investigator agreed on the sex act to be performed and she received the negotiated sum of $300, officers entered the room and detained her. Meanwhile, officers approached defendant's car and detained him. A search of his person revealed the following items: approximately $2,000 in cash, two cell phones (hereafter, HTC cell phone & ZTE cell phone), some currency from the Philippines, a credit card, a bank deposit receipt in the amount of $1,100, and a receipt from a 7-Eleven store in Seattle.

4

*JD2's and JD3's Testimony*

JD2's and JD3's testimony was similar to and consistent with JD1's testimony.[4] They both began working with defendant, who referred to himself as "Pharaoh" the tech/computer savvy personal assistant, after he promised to provide them Internet advertising services in exchange for a share of their earnings from prostitution activities. He gave them "professional" names and linked their phone numbers to his Google Voice account, which allowed him to monitor their communications and to communicate with clients on their behalf. He placed advertisements for them online (e.g., Backpage.com), set up their dates with clients, established the prices they charged for specific sex acts, booked their hotel rooms, drove them to meet clients, and waited nearby during their dates. He also provided JD2 with condoms and lubrication, and supplied some of the women with drugs.

Defendant was physically and verbally abusive to JD2. While he did not physically abuse JD3, he threatened her with physical violence and verbally abused her. He was also controlling over JD2 and JD3 and frequently angry. He demanded that the women he worked with stay in their hotel rooms all day; they were allowed to leave only with his permission. He decided how many dates the women would go on and attempted to make JD3 engage in sexual acts she was not comfortable with, including sex without a condom and allowing a client to urinate in her mouth. He also decided when the women had earned enough money to travel to a new location. At some point, he decided to take a larger share of JD2's and JD3's earnings. He also took JD2's bank card and withdrew money from her account to pay for expenses related to other women working with him.

During the time period JD2 worked with defendant, he also worked with JD1, JD3, JD5, JD6, JD8, JD9 and JD11. At times, JD2 worked with JD1, JD3, and JD5. She

---

[4] While the amended information charged defendant with committing sex offenses against 12 women, only three of those women testified at trial—JD1, JD2, and JD3.

5

explained that she occasionally shared a room with these women,[5] and that the "work" the women engaged in was exchanging sex for money. According to JD2, defendant treated JD1 better than the other women he worked with and seemed to care about her more and was more controlling over her. When asked, JD2 said that she saw defendant provide JD1 with condoms and lubrication.

During the time period JD3 worked with defendant, he also worked with JD1, JD2, JD6, JD8, and JD11. JD3 estimated that approximately 10 different women worked with defendant from the summer of 2016 to early 2017. When asked, JD3 indicated that the "work" the women engaged in was exchanging sex for money. She noted that she shared a room with JD1, JD6, JD8, and JD11.

After defendant was arrested, he called JD2 from jail and asked her to change the passwords to some of his accounts, including his Hotels.com account and his "pinknjuicy" and "yunggoon" e-mail accounts. He explained that she needed to do this because he "got caught human trafficking." He also told her not to talk to the police.

*Police Contact in Galt*

Around 12:15 a.m. on August 17, 2016, a Galt police officer found defendant asleep in his car, which was parked in a city parking lot. A search of the car revealed the following items: a large quantity of condoms, vaginal fungus cream, female hygiene products and toiletries, a bottle of Extenze pills (a male sex enhancement supplement), a piece of paper containing a list of e-mail addresses and passwords (one of which had JD5's name next to it), a laptop computer, and multiple motel keys and digital cameras. When the officer opened the laptop, he observed an e-mail account with a "bunch" of e-mails, one of which was asking about availability and prices for different sex acts. The laptop also contained numerous photos of women wearing lingerie or very little clothing.

---

[5] When the women shared a room, defendant had a rule that the women who were not on the date had to step outside the room when the client arrived.

When defendant was searched, the officer found cash, credit cards, and wire-transfer receipts in the amount of $1,030 and $130.

*Electronic Evidence*

Following defendant's arrest, the police monitored his jails calls. During one of those calls, he asked a woman to change the passwords to his Backpage.com account and his nottierose@gmail.com e-mail account. In doing so, he revealed the passwords to those accounts. Thereafter, a search warrant was obtained for several e-mail accounts associated with defendant: nottierose@gmail.com, zaemai@gmail.com, pinknjuicyqueens@gmail.com, and yunggoon.blogspot@gmail.com. The search yielded a large data file, which included folders for each of the women involved in this case, i.e., JD1 through JD12. Inside the folders were pictures of the women, some of which showed them posed in provocative positions. The women were partially nude or barely clothed in the pictures. The data file also contained a photograph of defendant and photographs of many of the women involved in this case in a file named "PinknJuicy Logo Designs."

A search warrant was also obtained for information from Hotels.com related to defendant's zaemai@gmail.com e-mail address. The information obtained from the execution of this warrant showed that between December 1, 2015, and March 15, 2017, this e-mail address was used in 432 hotel reservations with Hotels.com. The hotels were located in Seattle, and in various locations throughout the San Francisco Bay Area, the Sacramento area, Yuba City, the Central Valley, and Southern California. The reservations were made under the names of defendant, JD1, JD2, JD3, JD7, JD8, JD9, JD10, and JD11.

A search warrant was also obtained for documents from Backpage.com related to phone numbers and an e-mail address (pinknjuicyqueens@gmail.com) associated with defendant. In response to the warrant, Backpage.com provided law enforcement over 1,000 portable document format (PDF) files, all of which referenced the user name

7

nottierose@gmail.com.  The search revealed the following:  From May 23, 2015, to March 15, 2017, there were 241 posts for JD1.  From October 16, 2016, to March 16, 2017, there were 249 posts for JD2.  From April 11, 2016, to November 14, 2016, there were 74 posts for JD3.  From January 31, 2016, to February 22, 2016, there were two posts for JD4.[6]  From August 9, 2016, to February 2, 2017, there were 38 posts for JD5.  From April 11, 2016, to November 12, 2016, there were 20 posts for JD6.  From May 31, 2016, to September 16, 2016, there were 28 posts for JD7.  From November 5, 2015, to December 18, 2016, there were 76 posts for JD8.  From November 9, 2015, to March 16, 2017, there were 87 posts for JD9.  From March 29, 2016, to May 21, 2016, there were 23 posts for JD10.  From December 22, 2015, to November 30, 2016, there were 27 posts for JD11.  From December 12, 2015, to November 30, 2016, there were six posts for JD12.

The posts (i.e., advertisements) included barely clothed images of the women posed in provocative positions.  Some of the images contained nudity.

*Cell Phone Evidence*

A search of defendant's HTC cell phone disclosed that he had logged into the Backpage.com account with the user name nottierose@gmail.com on multiple occasions on the day he was arrested.  The data on the phone also showed that he had user accounts for various Web sites, including Backpage.com, Hotels.com, and Reddit.com.  The phone also had Google Voice service, which was associated with the nottierose@gmail.com e-mail address.

The HTC cell phone contained numerous e-mails from Backpage.com and Google Voice that were sent to the nottierose@gmail.com e-mail address.  In some of the e-mails from Backpage.com, defendant's name was printed underneath the

---

[6] JD4 was known as the Petite Princess, Lady Diana, or Lady D.

8

nottierose@gmail.com e-mail address. The HTC cell phone contained a list of 1,243 contacts, including zaemai@gmail.com, ladydianatheprincess@gmail.com, pinknjuicyqueens@gmail.com, nottierose@gmail.com, and yunggoon.blogspot@gmail.com. The contact profile for the zaemai@gmail.com e-mail account referenced defendant's ZTE cell phone number. The contact profile for defendant referenced the nottierose@gmail.com e-mail account.

A search of defendant's ZTE cell phone disclosed files with folders for some of the women involved in this case. The phone also had various applications (or "apps") on it, including apps for Hotels.com and Google Voice, and contained nearly 13,000 e-mails from Backpage.com indicating that advertisements had been renewed or moved to the top of the list. The e-mails were sent to the nottierose@gmail.com e-mail address, which was associated with defendant's name in the phone's contact list. In some of the e-mails from Backpage.com, defendant's name was in the body of the e-mail.

The ZTE cell phone also contained various other prostitution-related information (e.g., information related to Backpage.com advertisements) as well as images and/or messages involving JD1 through JD11 and Rade. There was also information related to JD1's and JD2's bank cards.

The HTC cell phone and ZTE cell phone both contained text message exchanges between JD1 and defendant. In one text message, JD1 indicated that she was considering working with another person due to defendant's behavior. There were also threatening messages sent from defendant to JD1. Among other things, he told her, "I beat Bitches for doing dumb shit," "Tomorrow I will beat your ass," and "Bitch, I'll smack the shit out of you." Defendant's cell phones also contained threatening text messages sent to JD2 and JD3. In one of the messages to JD2, defendant said: "I'm gonna beat you up stay off the phone while you're with your client." He also texted JD3, "I hit girls."

9

*Reddit.com*

Based on recorded jail conversations involving defendant, a warrant was obtained to search an online discussion blog, Reddit.com, for posts and comments by a user named "Zaemai" on the board "PimpFeet." The name Zaemai was associated with a photograph of defendant found on one of his cell phones.

The search revealed that in March 2015, August 2015, and May 2016, the user named Zaemai posted comments on the board PimpFeet. In the March 2015 post, Zaemai stated that he was "new to pimping" and asked for advice on how to "better advertise for more upscale clients." He wrote, "I have one ho right now from Eastern Europe who is about 30. We are in Nor Cal, about an hour and a half from Frisco, and making less than $500 a day online. I told her we are not leaving town until she makes 1K per day for 10 straight days. I am trying to figure out how to better advertise for more upscale clients. Can you all help? If I can figure that out, I may even be able to get a couple more hos added to my stable." In response to advice he received, he stated, "We are in Nor Cal, not far from Cow Town. We don't dance at clubs or hang out in hotels. She wants to move to a better apartment. As soon as we can figure out how to obtain some better clients, high-class independent escorts is my vision."

In the August 2015 post, the user named Zaemai commented on a post titled, "Knocking Independent Hos." He indicated that he had a woman that was "turning five tricks a day from Backpage" but complained that she had no high-end clients, no car, and a "shitty home." He wrote, "She has been independent for two years because the last P told her a bunch of shit and nothing happened. I like her because she's not on drugs and she stays in the room all day for a measly $300. I'm trying to get some information on how to get her out of this situation."

Later that same day, the user named Zaemai commented on a post titled, "Lacing Her With Game." In his comment, he offered advice on how to avoid the police, advising that, "One way to avoid the police is to teach her not to talk about services over

10

the telephone." He also advised that pimps should "[c]heck [their] local forum and read what independent providers are saying," explaining: "This site is more about clothes and cars pimps should try to catch bitches with as well as for passing on catch phrases and lingo to impress bitches. I've never seen any discussions on screening, booking travel arrangements, encryption devices, and that sort of stuff pimps in 2015 should be aware of. There are few pimps who are aware human trafficking is a charge a lot of young brothers are being dealt. Nobody wants to talk about that issue because it's boring. I'm not a pimp, I'm here for the entertainment."

In the May 2016 post, the user named Zaemai indicated that he was working with several prostitutes but complained about the price of hotel rooms and asked for help in how to secure a private residence, explaining that: "The challenge is I only want to stay a couple of months and I may have to stack two to three chickens in the same place and the traffic and headaches are sure to increase." He later posted several comments about pimping, including: "Being a pimp is about finding what a bitch lacks in her life and meeting that need for her. Identify the needs of a bitch and fulfill them, then use that to your advantage and that's the day you'll be a pimp." He also said, "When pimping crosses real life, many of y'all don't know where to go. . . . If a bitch want to raise my seed, she married to game for life. I ain't changing for no ho bitch. The heart of a pimp is a cold thing. . . . A bitch with kid just received a ball and chain with no key. That bitch has checkmated every time. She can't go nowhere, but back to me. I'm not a pimp, I'm here for the entertainment." In another comment, he said, "I do know pimps are supposed to get bitches to fall in love with them and trust them. There are no rules to getting another person to fall in love. A pimp has gotta do what path a pimp is to do to build his stable. . . . I ain't no pimp, I am here for the entertainment. Your pimp."

*Defendant's Testimony*

Defendant testified on his own behalf at trial. He confirmed that he began texting with JD1 around early 2014, and that they exchanged messages for about a year before

11

they met in person. At that time, he was living in Sacramento. Defendant explained that he started exchanging messages with JD1 after he saw her advertisement on MyRedBook.com. He claimed that he wanted to date her and that he did not know the Web site was commonly used to advertise prostitution services.[7]

After defendant met JD1 in person, she asked him if he was familiar with Backpage.com and posting advertisements on that Web site. She explained that another person had set up her Backpage.com account and that she did not know how to post advertisements online. Defendant claimed that he did not know anything about the Web site but agreed to take a look at it and get back to her. After doing some research, he agreed to post advertisements for her if she paid the posting fee. When asked, defendant could not recall ever having a conversation with JD1 about exchanging sex for money.

Defendant explained that he primarily used JD1's premium Backpage.com account, nottierose@gmail.com, for his postings on that Web site. He posted an advertisement for himself, offering his services as an assistant in various services, including marketing, creating profiles and Web pages, making travel arrangements, and screening clients. He acknowledged that he also posted advertisements for some of the women involved in this case. However, he claimed that the advertisements were not for prostitution activities. Rather, the advertisements he posted were for services that did not involve sexual acts (e.g., modeling, dancing, massages, body blotting). He insisted that he never encouraged the women to engage in prostitution activities with clients and claimed that he did not know exactly what the women did with clients. He also claimed that he did not use any nudity in his postings and did not advertise any services for money, although he bragged about his skill in posting advertisements and said that every

---

[7] MyRedBook.com was a "very explicit" Web site used to advertise prostitution activities. The advertisements on the site showed nude women and contained graphic descriptions of the services provided.

person he posted for told him they made more money with his advertisements.[8] According to defendant, the women he worked with had access to their advertisements, had seen them, and could delete them if they wanted to. He noted that JD1, JD5, JD8, JD9, and JD11 posted online advertisements for themselves and other women using JD1's Backpage.com account.

As for JD1, defendant explained that she was experienced in the "industry," and that she dated other men while they dated. She told him what cities they should travel to and where they should stay. He claimed that she worked with other men who posted advertisements for her, and that he did not care that she worked with these men. When asked, he said that he never forced her to travel without their daughter.

As for JD2, defendant explained that they agreed to start a business relationship after she responded to his Backpage.com advertisement. He claimed that their business relationship did not involve him arranging for her to have sex with other men in exchange for money. Rather, he agreed to fix and repost her advertisement on Backpage.com, and told her she would have to pay him about half of her earnings to cover advertisement fees, hotel costs, and transportation expenses. He admitted that he had access to her bank account and that he used her bank card to make hotel reservations in her name. When asked, he explained that he took JD2 and JD5[9] with him to Seattle in February 2017 for 7 to 10 days. He stayed with family while they stayed in hotel rooms he booked for them.

---

[8] The postings indicated that "services" could be obtained in exchange for "donations." Some of the postings stated that 15 minutes of service equals 60 roses. Defendant acknowledged that "roses" meant the amount of money the services would cost, explaining that Backpage.com did not allow advertisements to specify how much money services cost.

[9] Defendant explained that JD5 had been "in the game a lot longer" than the other women he worked with, and that she just wanted him to post advertisements for her and let her do her "own thing." She refused to link her phone number with his Google Voice account.

13

As for JD3, defendant explained that he met her in March 2016 through one of her friends who was already working with him—JD6. Thereafter, they entered into a similar business relationship that he had with JD2, except that he estimated JD3's expenses would be about 30 percent of her earnings because she was only 18 years old and needed to share a hotel room with other women for safety reasons.

As for JD4 through JD12, defendant admitted that he posted advertisements for JD5, JD8, JD9, and JD12, but denied or did not remember posting advertisements for JD4, JD6, JD10, and JD11.[10] He claimed that he was not the primary person who responded to clients asking for services from the women he worked with. Rather, he only replied and communicated with clients if the women asked him to, or when he first started working with them. He further explained that all of the women who worked with him shared a hotel room at some point, and that he did not force them to do anything. He noted that his financial arrangement with each woman was different; the amount they paid him depended on their expenses. According to defendant, the women did not work for him but rather he worked with them. He was just their assistant.

Defendant denied beating any of the women involved in this case but admitted to smacking JD1's head once and "popp[ing]" her in the face once. He also admitted that he hit his daughter once, and that he pushed JD2 one time and sent text messages to JD1, JD2, and JD3 threatening to hit them. He explained that he threatened to beat JD2 because she was texting while on a date with a client. He further explained that he threatened to beat JD1 because she texted negative things all day and called him a "stupid, dumb nigger."

Defendant admitted that he linked JD1's, JD2's, and JD3's phone numbers to his Google Voice account but claimed that he did not set up dates for them on his own,

---

[10] When defendant was shown a picture of JD4 he said that he recognized her but did not believe that he had posted any advertisements for her.

explaining that he only responded to messages from clients when the women requested his assistance.  He maintained that he did not provide condoms or drugs to any of the women who worked with him.  When asked about the numerous condoms found in his car by the Galt police officer, he claimed the condoms belonged to him, explaining that he had many girlfriends.

Although he was aware that the owner of Backpage.com was arrested on prostitution charges, defendant admitted that he continued to post advertisements on that Web site.  He also admitted that he observed men come to the hotel rooms occupied by the women in this case and stay for a short period of time, and that he collected money from the women to pay for online advertising and other costs associated with their working relationship.  However, he insisted that he did not know exactly what the women did for the money they received.  He made this claim after he was confronted with evidence of two text messages he sent to JD1, which said:  "You need your ass kicked because it's wrong to have the baby in front of a client having sex," and "You're looking for a guy that follows you around while you fuck whoever, but want some for money and others don't have to pay."  Defendant did not deny sending these messages.  Instead, he explained that the messages were meant to be hurtful.

Defendant denied posting any comments to the PimpFeet board on Redditt.com, explaining that the e-mail account associated with the postings (zaemai@gmail.com.) was a "group account" accessible by several other people and that one of those people must have made the postings.

**Procedural History**

In June 2018, an amended information was filed in the El Dorado County Superior Court charging defendant with 18 counts:  human trafficking (§ 236.1, subd. (b); counts 1, 4, & 7); pimping (§ 266h, subd. (a); counts 2, 5, & 8), and pandering by procuring (§ 266i, subd. (a); counts 3, 6, & 9 through 18).  Counts 1 through 3 were alleged to have occurred in El Dorado County and involved JD1.  Count 18 was alleged to have occurred

15

in Santa Clara County and involved JD12. The remaining counts were all alleged to have occurred in Sacramento County and involved JD2 (counts 4, 5, & 6), JD3 (counts 7, 8, & 9), JD4 (count 10), JD5 (count 11), JD6 (count 12), JD7 (count 13), JD8 (count 14), JD9 (count 15), JD10 (count 16), and JD 11 (count 17).

Following a jury trial, defendant was found guilty on counts 2, 3, 5, 6, and 8 through 17 (i.e., 11 counts of pandering involving JD1 through JD11 & three counts of pimping involving JD1, JD2, & JD3). He was found not guilty on counts 1, 4, 7 (i.e., the human trafficking counts involving JD1, JD2, & JD3), and count 18 (pandering involving JD12). The trial court sentenced him to an aggregate term of 19 years 4 months in state prison.

Defendant filed a timely notice of appeal.

## DISCUSSION

### 1.0 Improper Venue

As noted, this case was prosecuted in El Dorado County. The amended information alleged that counts 1 through 3 occurred in El Dorado County and counts 4 through 17 occurred in Sacramento County. According to the People, jurisdiction was proper in El Dorado County as to counts 4 through 17 pursuant to section 784.7, subdivision (c)—the statute authorizing a single trial of specified sex offenses committed in multiple counties. On appeal, defendant contends that his convictions on counts 10 through 17 must be reversed due to improper venue.[11] He argues that the trial court lacked jurisdiction over these counts because the People failed to present written

---

[11] Defendant concedes that venue was proper in El Dorado County with respect to counts 4 through 9, which involved JD2 and JD3. He notes that the Sacramento County District Attorney agreed to venue in El Dorado County for these counts, citing two letters written by the Sacramento County District Attorney's Office. The first letter is dated November 14, 2017, while the second letter is dated February 18, 2018. The second letter was prepared four days before the felony complaint was filed alleging counts 1 through 9.

16

evidence showing that the Sacramento County District Attorney's Office agreed to the prosecution of the offenses in El Dorado County.[12]  We disagree.

### 1.1 *Applicable Legal Principles*

Determining the proper venue presents an issue of law to be decided prior to trial. (*People v. Posey* (2004) 32 Cal.4th 193, 201.)  Accordingly, we apply the de novo standard of review.  (*People v. Galvan* (2008) 168 Cal.App.4th 846, 852.)

"Traditionally, venue in a criminal proceeding has been set, as a general matter, in the county or judicial district in which the crime was committed.  Under the provisions of . . . section 777, that continues to be the general rule in California.  That statute provides in part:  '[E]xcept as otherwise provided by law the jurisdiction of every public offense is in any competent court within the jurisdictional territory of which it is committed.' " (*People v. Simon* (2001) 25 Cal.4th 1082, 1093-1094 (*Simon*), fns. omitted; see § 777.)

Nevertheless, "[a]lthough under section 777 the county in which a felony was committed is, in the absence of another statute, the locale designated as the place for trial, in California numerous statutes--applicable to particular crimes or in specified circumstances--long have authorized the trial of a criminal proceeding in a county other than the county in which the offense itself occurred."  (*Simon, supra,* 25 Cal.4th at p. 1094.)  Accordingly, as long as a statute provides for a trial to be in a county other than the one in which the crime was committed, a defendant has no "right" to be tried in the locale of the crime.  A change of venue may be ordered by the court in a criminal case

---

[12]  Defendant also asserts that venue was improper in El Dorado County with respect to count 18, which allegedly occurred in Santa Clara County.  However, as defendant and the People recognize, we need not address this contention because defendant was acquitted on count 18.  Therefore, we limit our venue inquiry to counts 10 through 17, which charged defendant with pandering in Sacramento County.

17

under appropriate circumstances. (*Id*. at p. 1097 [explaining that "venue statutes do not involve a court's jurisdiction in the fundamental sense of subject matter jurisdiction"].)[13]

Section 784.7, subdivision (c) provides: "If more than one violation of Section 236.1 [(human trafficking)], 266h [(pimping)], or 266i [(pandering)] occurs in more than one jurisdictional territory, the jurisdiction of any of those offenses, and for any offenses properly joinable with that offense, is in any jurisdiction where at least one of the offenses occurred, subject to a hearing pursuant to Section 954, within the jurisdiction of the proposed trial. At the Section 954 hearing, the prosecution shall present written evidence that all district attorneys in counties with jurisdiction of the offenses agree to the venue. Charged offenses from jurisdictions where there is not a written agreement from the district attorney shall be returned to that jurisdiction. In determining whether all counts in the complaint should be joined in one county for prosecution, the court shall consider the location and complexity of the likely evidence, where the majority of the offenses occurred, the rights of the defendant and the people, and the convenience of, or hardship to, the victim or victims and witnesses."

"A defendant's right to be tried in a venue authorized by statute is a right subject to waiver by the defendant." (*People v. Aleem* (2006) 144 Cal.App.4th 1155, 1160, fn. 9, citing *Simon, supra*, 25 Cal.4th at p. 1097.) In *Simon*, our Supreme Court stated, "[T]aking into account the nature and purpose of the venue safeguard and the substantial state interest in protecting the integrity of the process from improper 'sandbagging' by a defendant, we conclude that a defendant who fails to raise a timely objection to venue in a felony proceeding forfeits the right to object to venue—either at trial or on appeal." (*Simon,* at p. 1104.)

---

**13** "In California, a superior court has subject matter jurisdiction with regard to any felony offense committed within the state, no matter where the offense was committed." (*Simon, supra*, 25 Cal.4th at p. 1097, fn. 8.)

18

1.2     *Analysis*

The amended information charged defendant with human trafficking (§ 236.1, subd. (b)), pimping (§ 266h, subd. (a)), and pandering (§ 266i, subd. (a)) in El Dorado County and in Sacramento County.  Defendant did not file a pretrial motion objecting to venue in El Dorado County.  Nor did defense counsel orally object to venue at the pretrial hearing where the prosecutor submitted three "jurisdiction letters" from the Sacramento County District Attorney's Office.  Instead, defense counsel asked the trial court whether the submitted letters would be part of the court's file for purposes of the "appellate process."  On this record, we conclude defendant has forfeited his improper venue claim. But even assuming the claim was preserved for appeal, it lacks merit.

Having reviewed the relevant "jurisdiction" letters submitted to the trial court, we conclude the record contains sufficient written evidence demonstrating that the district attorney in the county with jurisdiction over the offenses alleged in counts 10 through 17 agreed to venue in El Dorado County.  A fair reading of the record does not support defendant's contention that the Sacramento County District Attorney did not agree that venue was proper in El Dorado County with respect to these offenses.  The record reflects that an amended complaint adding counts 10 through 17 was filed in March 2018.  These counts alleged pandering in Sacramento County involving JD4 through JD11.  Eight days after the amended complaint was filed, the Sacramento County District Attorney's Office sent a letter (i.e., the "third" letter) to the El Dorado County District Attorney's Office agreeing to venue in El Dorado County for these offenses.  The fact that the letter refers to the prosecution of defendant for "Human Trafficking charges" and does not specifically mention pandering is not a basis to reverse defendant's convictions on counts 10 through 17 for improper venue.  The letter makes clear that the Sacramento County District Attorney's Office agreed to the prosecution of defendant in El Dorado County for the offenses alleged in counts 10 through 17.  The letter indicates that the Sacramento County District Attorney's Office was aware that, during the course of the investigation

19

of defendant for human trafficking, "it was determined that . . . several of the victims suffered *similar conduct* by . . . defendant in Sacramento."[14] (Italics added.) The letter goes on to state, "It is our intention, by virtue of this letter, to enter into an agreement with your office [(i.e., the El Dorado County District Attorney's Office)] pursuant to Penal Code section 784.7[, subdivision] (c), for your office to prosecute the acts of human trafficking which occurred in Sacramento by [defendant]."[15]

On this record, we cannot conclude that reversal is required due to improper venue. Defendant provides no authority and legal analysis compelling a contrary conclusion. Nor has he explained the purpose of the third letter written by the Sacramento County District Attorney's Office. As noted, defendant concedes that the two earlier letters written by the same office showed that the Sacramento County District

[14] The third letter specifically references the prosecution of defendant for human trafficking charges arising out of "an investigation by the Sacramento Sheriff's Department, report #17-0366120 and El Dorado District Attorney's Report #17-03-1553." The parties do not dispute that the referenced investigation and reports were the basis for counts 1 through 9. The first two letters written by the Sacramento County District Attorney's office explain that the Sacramento Sheriff's Department report documents a series of incidents which occurred in Sacramento County from December 2016 to March 2017 while the El Dorado County District Attorney's report documents a series of incidents which occurred in Sacramento County from May 2016 to August 2016.

[15] The amended complaint charged defendant with three counts of human trafficking in violation of section 236.1, subdivision (b). "Under California law, the crime of human trafficking is comprised of three distinct offenses, which are codified in section 236.1: (1) the deprivation or violation of the personal liberty of another with the intent to obtain forced labor or services (§ 236.1, subd. (a)); (2) the deprivation or violation of the personal liberty of another with the intent to violate one of several specified Penal Code provisions (§ 236.1, subd. (b)); and (3) causing or attempting to cause a person who is a minor to engage in a commercial sex act with the intent to violate one of several specified Penal Code provisions (§ 236.1[, subd.] (c))." (*People v. Shields* (2018) 23 Cal.App.5th 1242, 1248-1249.) With respect to the distinct offense codified in section 236.1, subdivision (b), the specified Penal Code provisions include pimping (§ 266h) and pandering (§ 266i). (§ 236.1, subd. (b).)

20

Attorney agreed to venue in El Dorado County for counts 4 through 9. In view of the timing and content of the third letter, it is evident that its purpose was to provide consent to the prosecution of counts 10 through 17 in El Dorado County.

**2.0    Sufficiency of the Evidence**

Defendant contends his convictions on counts 10 through 17 must be reversed because substantial evidence does not support the conclusion that he was guilty of pandering involving JD4 through JD11. He argues there was insufficient evidence to establish that he "affirmatively influenced" any of these women to "become a prostitute or continue in prostitution." We disagree.

2.1    *Standard of Review*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

" 'The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence . . . . [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

21

The jury is entitled to draw reasonable inferences based on the evidence (*People v. Livingston* (2012) 53 Cal.4th 1145, 1166), and we must accept all logical inferences the jury might have drawn from the evidence, even if we would have concluded otherwise (*People v. Salazar* (2016) 63 Cal.4th 214, 242). " 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Id*. at p. 357.)

2.2     *Applicable Legal Principles*

Pandering is "the business of recruiting a prostitute, finding a place of business for a prostitute, or soliciting customers for a prostitute." (*People v. Dixon* (2011) 191 Cal.App.4th 1154, 1159-1160.) A panderer is "one ' "who procures the gratification of the passion of lewdness for another." ' " (*Id*. at p. 1156.)

The crime of "pandering comprises a broad range of conduct. [¶] The purpose of . . . section 266i is to ' ". . . cover all the various ramifications of the social evil of pandering and include them all in the definition of the crime" . . . . ' " (*People v. DeLoach* (1989) 207 Cal.App.3d 323, 333.) In enacting section 266i the Legislature sought to "prevent prostitution 'by discouraging persons other than the prostitute from augmenting and expanding a prostitute's operation, or increasing the supply of available prostitutes. [Citations.]' " (*People v. Zambia* (2011) 51 Cal.4th 965, 973 (*Zambia*).) Taken together, "[t]he plain intent and purpose behind all the provisions of section 266i . . . is to deter pimps or others from establishing new working relationships in the unlawful prostitution trade." (*Id*. at p. 978.)

Subdivision (a) of section 266i has six subparts that " 'define the different circumstances under which the crime of pandering may be committed.' " (*People v. Leonard* (2014) 228 Cal.App.4th 465, 490 (*Leonard*).) The commission of any one of the acts described in subdivision (a) constitutes the offense of pandering. (*People v. Charles* (1963) 218 Cal.App.2d 812, 816.) The statutory subparts or alternatives are not mutually exclusive, i.e., the subparts can be violated at the same time. (See *People v. Montgomery* (1941) 47 Cal.App.2d 1, 12, 24, 27-28 (*Montgomery*), disapproved on another ground in *Murgia v. Municipal Court for Bakersfield Judicial Dist.* (1975) 15 Cal.3d 286, 301, fn. 11, *People v. Dillon* (1983) 34 Cal.3d 441, 454, fn. 2, & *Zambia, supra*, 51 Cal.4th at p. 981; see also *People v. Lax* (1971) 20 Cal.App.3d 481, 486.) The relevant subparts of subdivision (a) here are (1), (2), and (5).[16]

Section 266i, subdivision (a)(1), provides that a person is guilty of pandering if he "[p]rocures another person for the purpose of prostitution." In the context of the pandering statute, the term "procure" has been construed to mean "assisting, inducing, persuading or encouraging" a person to engage in prostitution.[17] (*People v. Schultz*

---

[16] At the close of evidence the jury was instructed on the crime of pandering without objection. Although the charging document only specifically referenced liability under subdivision (a)(1) of section 266i (i.e., pandering by procuring), the instruction on pandering included liability predicated on subdivision (a)(1), (a)(2), and (a)(5) of the pandering statute.

[17] The leading law dictionary defines the term "procure" as follows: "1. To obtain (something), esp. by special effort or means. 2. To achieve or bring about (a result). 3. To obtain a sexual partner for another, esp. an unlawful partner such as a minor or a prostitute." (Black's Law Dictionary (11th ed. 2019) p. 1460.) Among other things, the Merriam-Webster dictionary defines the term "procure" to mean: (1) "to get possession of: obtain, acquire"; (2) "to get possession of (women) and make available for promiscuous sexual intercourse (as in a house of prostitution)"; (3) "to cause to happen or be done: bring about"; and (4) "to prevail upon to do something indicated: induce." (Merriam-Webster Unabridged Dict. (Online ed. 2016) <https://unabridged.merriam-

(1965) 238 Cal.App.2d 804, 812 (*Schultz*); *Montgomery*, *supra*, 47 Cal.App.2d at p. 12 ["the term 'procure' as used in the . . . [pandering] statute necessarily implies the use of persuasion, solicitation, encouragement and assistance in achieving the unlawful purpose"].)[18]  The definition of "prostitution" as used in the pandering statute means " ' "sexual intercourse between persons for money or other consideration" and "*lewd*" acts, for money or other consideration, confined to conduct where the genitals, buttocks or female breasts of either the prostitute or the customer come in contact with some part of the body or the other for the purpose of sexual arousal or gratification of the customer or of the prostitute.' " (*People v. Maita* (1984) 157 Cal.App.3d 309, 317-318.)

Section 266i, subdivision (a)(2), provides that a person is guilty of pandering if he "[b]y promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute."  Our Supreme Court has held that causing, inducing, persuading or encouraging someone to "become a prostitute" under this statute includes not only "recruiting someone to enter the prostitution trade for the first time" but also behavior directed at "someone who is already an active prostitute." (*Zambia, supra*, 51 Cal.4th at pp. 973, 980-981 [this provision "places the focus on the defendant's unlawful actions and intent, rather than making the targeted victim's character or occupation the determinative factors for conviction"].)[19]  The *Zambia* court

---

webster.com/unabridged/procure> [as of Apr. 3, 2020], archived at: <https://perma.cc/6ESL-MMUW>.)

[18]  We note that the Legislature has amended the pandering statute numerous times since *Montgomery* and *Schultz* were issued without altering the appellate court's interpretation, giving rise to a presumption that lawmakers acquiesce in the courts' construction of the statute.  (*Zambia, supra*, 51 Cal.4th at pp. 975-976; accord, *Ryan v. Rosenfeld* (2017) 3 Cal.5th 124, 132-133 ["decades of legislative inaction" in response to settled judicial interpretation of a statute signal acquiescence].)

[19]  The *Zambia* court noted that the crime of pandering is complete under section 266i, subdivision (a)(2) when "the defendant 'encourages another person to become a

recognized "that when a pimp offers protection and support to a prostitute in return for some or all of her income, the offer increases the likelihood that the prostitute will be able to maintain or expand her activities, an outcome squarely at odds with the statutory goal." (*Id.* at p. 974.) The court further found that "[t]o encourage an established prostitute to change her business relationship necessarily implies that a defendant intends a victim 'to become a prostitute' in the future regardless of her current status." (*Id*. at p. 975.)

Section 266i, subdivision (a)(5), provides a person is guilty of pandering if he "[b]y fraud or artifice, or by duress of person or goods, or by abuse of any position of confidence or authority, procures another person for the purpose of prostitution, or to enter any place in which prostitution is encouraged or allowed within this state, or to come into this state or leave this state for the purpose of prostitution."

Pandering is a specific intent crime. To be guilty of the offense, the defendant must have the specific intent to persuade, encourage or otherwise influence the target to become a prostitute. (*Zambia, supra*, 51 Cal.4th at p. 980 [construing § 266i, subd. (a)(2)].) In clarifying that pandering is a specific intent crime, our Supreme Court explained that "the purpose and intent of the pandering statute . . . is to criminalize the *knowing and purposeful* conduct of any person seeking to encourage 'another person' to work with the panderer or another pimp in plying the prostitution trade." (*Zambia,* at p. 980.) While *Zambia* involved the construction of section 266i, subdivision (a)(2), our Supreme Court analyzed each of the subparts of subdivision (a) and concluded that liability for the proscribed conduct attaches regardless of whether the victim is already acting as a prostitute. The *Zambia* court stated, "[W]hen harmonized and read together in

---

prostitute' by 'promises, threats, violence, or by any device or scheme . . . .' [Citation.] There is no requirement that defendant succeed." (*Zambia, supra*, 51 Cal.4th at p. 981, fn. 8.) In doing so, the court reiterated that "the focus is on the actions and intent of the panderer, not the target." (*Ibid*.)

context, [the subparts of section 266i, subdivision (a)] plainly envision that any solicited 'person,' whether an active prostitute or not, may be the target of unlawful pandering." (*Zambia, supra*, 51 Cal.4th at pp. 977-978; *id*. at p. 981.) Such an interpretation "carries out the Legislature's intent to combat the social evils inherent in recruitment for acts of prostitution, the perpetuation of the trade by the management and support offered by pimps, and the particularly coercive and socially dysfunctional activities associated with brothels." (*Id*. at pp. 980-981 [noting that § 266i, subd. (a)(3) & (a)(4) are directed at conduct involving brothels].)

The crime of pandering requires no monetary gain. (§ 266i, subd. (a).) By contrast, the related crime of pimping involves the deriving of support from another person's prostitution. (§ 266h, subd. (a).)[20]

2.3    *Analysis*

Viewing the evidence in the light most favorable to the judgment, we conclude there was sufficient evidence from which a reasonable jury could have concluded defendant was guilty on counts 10 through 17, which charged him with pandering involving JD4 through JD11.

At the outset, we pause to note that defendant does not challenge the sufficiency of the evidence with respect to his pandering convictions involving JD1, JD2, or JD3. And with good reason. As set forth above, those witnesses testified in detail about how defendant assisted and encouraged them to engage in prostitution activities in exchange for a share of their earnings. Their testimony was corroborated by the sting operation,

_____

[20] Section 266h provides, in part: "[A]ny person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution, or from money loaned or advanced to or charged against that person by any keeper or manager or inmate of a house or other place where prostitution is practiced or allowed, or who solicits or receives compensation for soliciting for the person, is guilty of pimping, a felony . . . ." (§ 266h, subd. (a).)

defendant's testimony, evidence discovered during electronic searches (including cell phones), and searches of defendant's person and car. We reject defendant's contention that there was insufficient evidence to support the pandering convictions as to JD4 through JD11 because they did not testify, and therefore there was no substantial evidence establishing that he "affirmatively influenced" any of these women "to become or be a prostitute." On this record, there was sufficient evidence from which a reasonable jury could infer that defendant was guilty of pandering involving JD4 through JD11.

Collectively, the testimony of JD1, JD2, and JD3 showed that defendant worked with JD4 through JD11, and that the "work" the women engaged in was prostitution activities. There was also evidence that defendant knowingly assisted and encouraged JD4 through JD11 to engage in such activities. Among other things, the evidence showed that he posted online advertisements for each of these women to perform "services," which contained images of them barely clothed and posed in provocative positions. Some of the images contained nudity. The evidence also showed that defendant booked hotel rooms for JD5 and JD7 through JD11. In addition, there was evidence—the postings on Reddit.com—from which a reasonable jury could have concluded that defendant admitted to being a pimp who assisted and encouraged the women he worked with to engage in prostitution activities. When defendant testified, he admitted that he posted advertisements for some of the nontestifying Jane Does, including posting advertisements on Backpage.com, which was a Web site commonly used to advertise for prostitution activities.

In view of the record, we conclude substantial evidence supports the pandering convictions on counts 10 through 17 involving JD4 through JD11. A reasonable jury could have found the essential elements of the crime as to each woman beyond a reasonable doubt. The evidence established that defendant was in the business of recruiting prostitutes, finding a place of business for them (hotels), and soliciting

27

customers for them. Substantial evidence supports the jury's conclusion that JD4 through JD11 were part of that business.

Contrary to defendant's contention, reversal is not required because there was no evidence that certain Jane Does actually engaged in an act of prostitution. The crime of pandering does not require that actual acts of prostitution take place. (*People v. Osuna* (1967) 251 Cal.App.2d 528, 531.)

Finally, we reject defendant's contention that the evidence was insufficient to convict him of pandering by procuring because the evidence only showed that he helped or assisted the nontestifying Jane Does engage in prostitution by booking hotel rooms and/or posting online advertisements. In support of his position, defendant relies on *People v. Mathis* (1985) 173 Cal.App.3d 1251 (*Mathis*), which he argues recognized that " 'procure' " does not mean assist, and that "[i]f a person decides to become a prostitute on her own, and the defendant helps her engage in prostitution without affirmatively influencing her decision, the defendant could be guilty of aiding and abetting [prostitution], but would not be guilty of pandering." Contrary to defendant's suggestion, *Mathis* does not hold as a matter of law that where a defendant assists a person who has already decided to become a prostitute, the specific intent required for pandering cannot be satisfied. Rather, the *Mathis* court held that the crime of pandering requires the specific intent to affirmatively influence a person to become a prostitute, and that the question of the defendant's intent is for the jury to decide, under a proper instruction. (*Id.* at p. 1256.) In *Mathis*, the court reversed and remanded for retrial of the pandering charges because the trial court had erroneously instructed the jury that the defendants could be convicted if they " '*assisted*, induced, persuaded, or encouraged another person to become a prostitute.' " (*Id.* at p. 1255.) Because the instruction added the word "assisted" to the statutory terms, the *Mathis* court reasoned that the jury could have convicted the defendants even if it found that they did not specifically intend to affirmatively influence the victim to become a prostitute, but only helped her begin a new

28

career.  (*Id*. at p. 1256 & fn. 7.)  *Mathis* instructs that while the specific intent required for pandering by procurement "may well be inferred from acts of assistance, 'we cannot extrapolate therefrom, as a matter of law, that the inference *must* be drawn.  Intent [to influence] is what must be *proved . . . .*' "  (*Id*. at p. 1256.)  Here, unlike in *Mathis*, the jury was not instructed that it could convict defendant of pandering by procuring for mere assistance.  Rather, the jury was instructed that defendant could be convicted on this theory only if it found that the People proved he "successfully persuaded/procured a Jane Doe to become a prostitute" with the "inten[t] to influence [her] to be a prostitute."  As we have discussed, the evidence was sufficient to support the pandering convictions involving the nontestifying Jane Does.

**3.0     Constitutional Challenge to the Pandering Statute**

Defendant contends that section 266i, subdivision (a)(1), which criminalizes the "[p]rocur[ing of] another person for the purpose of prostitution," is unconstitutionally vague.  His constitutional challenge is predicated on his contention that the term "procure" along with the phrase "for purpose of prostitution" are impermissibly vague in violation of due process.  First, he argues that the provision is unconstitutionally vague on its face because it fails to provide "intelligible" notice of what is prohibited.  According to defendant, the term "procure" is this context "is ambiguous, confusing, and difficult to understand."  He insists that the provision "is so vague that it could be read as making it a felony for anyone to do anything relating to the prostitution of another person."  Second, he argues that the provision is void for vagueness because, as applied to him in this case, "the statutory language failed to give [him] fair notice that his conduct could amount to pandering by procuring, as defined in that subdivision."  According to defendant, "[t]he statute gives notice that activity undertaken 'for the purpose of prostitution' fell within the broad scope of the subdivision, but the vague term 'procure' used in that context failed to differentiate between innocent activity, aiding and abetting misdemeanor prostitution, and felony pandering.  It failed to give [him] fair notice that posting an

29

escort ad or providing technical escort assistance could amount to a felony."  We reject each of defendant's related contentions, which we discuss together.

### 3.1 *Applicable Legal Principles*

"The constitutional interest implicated in questions of statutory vagueness is that no person be deprived of 'life, liberty, or property without due process of law,' as assured by both the federal Constitution (U.S. Const., Amends. V, XIV) and the California Constitution (Cal. Const., art. I, § 7).  Under both Constitutions, due process of law in this context requires two elements:  a criminal statute must ' "be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt." ' "  (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 567; see *People v. Maciel* (2003) 113 Cal.App.4th 679, 683 [" ' "[A] penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." ' "].)

" 'Although the [void-for-vagueness] doctrine focuses both on actual notice to citizens and arbitrary enforcement, . . . the more important aspect of the vagueness doctrine "is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement."  [Citation.]  Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." ' "  (*People v. Brown* (2017) 14 Cal.App.5th 320, 336.)

" ' "[T]he starting point of our analysis is 'the strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. . . ." ' [Citation.]" [Citation.]' "  (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 543.)  " 'The fact that a term is somewhat imprecise does not itself offend due process.  Rather, so long as the language sufficiently warns of the proscribed

conduct when measured by common understanding and experience, the statute is not unconstitutionally vague.' [Citation.] 'Inasmuch as " '[w]ords inevitably contain germs of uncertainty,' " mathematical precision in the language of a penal statute is not a sine qua non of constitutionality. [Citation.]' " (*Ibid.*)

" ' "A statute . . . cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." ' [Citation.] Therefore, 'a party must do more than identify some instances in which the application of the statute may be uncertain or ambiguous; he must demonstrate that "the law is impermissibly vague *in all of its applications*." . . . [Citation.]' [Citation.]" (*People v. Morgan* (2007) 42 Cal.4th 593, 605-606.) Indeed, " '[m]any, probably most, statutes are ambiguous in some respects and instances invariably arise under which the application of statutory language may be unclear.' " (*People v. Ervin* (1997) 53 Cal.App.4th 1323, 1328-1329 [rejecting vagueness challenge as to " 'immediately after' " and " 'in the vicinity' " in statute punishing robberies taking place while the victim is using an ATM "or immediately after the person has used an [ATM] and is in the vicinity of the [ATM]"].) " '[A] statute will not be held void for vagueness at the behest of a defendant whose conduct falls clearly within its bounds. [Citation.]' " (*Ibid.*)

"[I]n determining whether the relevant language of [the statute] is sufficiently certain to meet the constitutional requirement of fair notice, 'we look first to the language of the statute, then to its legislative history, and finally to the California decisions construing the statutory language.' " (*People v. Heitzman* (1994) 9 Cal.4th 189, 200.)

3.2    *Analysis*

We conclude that defendant's constitutional challenge to the pandering statute is without merit. A similar challenge was rejected nearly 45 years ago in *People v. Hashimoto* (1976) 54 Cal.App.3d 862 (*Hashimoto*). In that case, the appellate court explained that section 266i is "designed to discourage prostitution by discouraging persons other than the prostitute from augmenting and expanding a prostitute's operation,

31

or increasing the supply of available prostitutes." (*Hashimoto*, at p. 867.) The court concluded that the language of section 266i is not vague, reasoning: "It is not reasonably susceptible of being interpreted to cover any activity beyond that involved in the social evil of pandering. [Citation.] The terms 'procuring, persuading and encouraging' are all words capable of precise definition. [Citations.] [¶] The test is whether the conduct of the defendant meets the commonly accepted definitions of the words used in the statute." (*Hashimoto*, at p. 867.) We agree with the reasoning of *Hashimoto*.

The fact that section 266i does not define the term "procure" does not render the statute unconstitutionally vague. The language of the statute is sufficiently clear and settled to provide fair notice of the proscribed conduct. Indeed, long-standing case law in effect at the time of defendant's offenses provided adequate guidance as to what the term "procure" means in the context of pandering. Since 1941, case law has construed the term to mean assisting, inducing, persuading or encouraging a person to engage in prostitution. (*Montgomery, supra*, 47 Cal.App.2d at p. 12.) Such a construction is consistent with the purpose and intent of the pandering statute, which our Supreme Court has explained is to criminalize the knowing and purposeful conduct of any person seeking to persuade, encourage, or otherwise influence the target to become a prostitute. (*Zambia, supra*, 51 Cal.4th at p. 980.) In concluding that the six subparts of subdivision (a) of section 266i apply to any victim, regardless of whether that victim is already acting as a prostitute, the *Zambia* court explained, "The plain intent and purpose behind all the provisions of section 266i, taken together, is to deter pimps or others from establishing new working relationships in the unlawful prostitution trade. Our appellate courts have long recognized that California's pandering statute ' "cover[s] all the various ramifications of the social evil of pandering and include[s] them all in the definition of the crime, with a view of effectively combating the evil sought to be condemned." ' " (*Zambia*, at p. 978.) Accordingly, we conclude defendant had fair notice of what was proscribed under section 266i, subdivision (a)(1) at the time of his offenses.

We recognize that the Bench Notes to the pattern instruction for the crime of pandering (CALCRIM No. 1151) explain that the term "persuade" was included as an option in element one where, as here, section 266i, subdivision (a)(1) applies because the term " 'procure' may be difficult for jurors to understand."[21] However, it does not follow, as defendant suggests that section 266i, subdivision (a)(1) is impermissibly vague in violation of due process. The inclusion of the term "persuade" in the pattern instruction is supported by case law and reflects the Judicial Council's determination that such an option would necessarily assist the jury in determining whether or not a defendant is guilty of violating section 266i, subdivision (a)(1). In the context of this subpart of section 266i, "persuading" is simply a means by which the illegal act of "procuring" may be achieved.

**4.0 Alleged Instructional Errors**

4.1 *Standard of Review*

"In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) A claim of instructional error is reviewed de novo. (*People v. Cole* (2004) 33 Cal.4th

---

[21] In relevant part, CALCRIM No. 1151 states: "The defendant is charged [in Count [insert count No.]] with pandering [in violation of Penal Code section 266i]. [¶] To prove that the defendant is guilty of pandering, the People must prove that: [¶] . . . [¶] [1. The defendant successfully (persuaded/procured) [insert name] to become a prostitute(;/.)] [¶] . . . [¶] AND [¶] [2. The defendant intended to influence [insert name] to be a prostitute(;/.)" We note that the pattern instruction also uses the "persuade/procure" language in other alternatives to element one. (*Ibid.*) In addition, in another alternative to element one not implicated by the facts of this case, the pattern instruction uses the language "arranged/procured." (*Ibid.*) The Bench Notes explain that "arrange" was included as an option in element one because "the statutory language 'procure' may be difficult for jurors to understand." (Bench Notes to CALCRIM No. 1151 (2020 ed.) p. 936.)

1158, 1210.) An appellate court independently reviews the wording of a jury instruction and assesses whether the instruction accurately states the law. (*People v. Posey, supra*, 32 Cal.4th at p. 218.) When making this determination, we consider the instructions taken as a whole; we also presume jurors are intelligent people capable of understanding and correlating all jury instructions and applying them to the facts of the case. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220, overruled on another ground by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; *People v. Smith* (2008) 168 Cal.App.4th 7, 13.)

The *Watson*[22] standard of prejudice (i.e., the error is reversible when there is a reasonable probability defendant would have obtained a more favorable result in the absence of the error) applies to an instruction that misdirects the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions. In contrast, the *Chapman*[23] standard of review (i.e., error is harmless only when it appears beyond a reasonable doubt that the error did not contribute to the verdict obtained) applies when an instruction improperly describes or omits an element of the offense. (*People v. Larsen* (2012) 205 Cal.App.4th 810, 829-830.)

### 4.2 *CALCRIM No. 1151*

#### 4.2.1 *Additional Background*

At the close of trial, the jury was instructed orally and in writing on the crime of pandering in accordance with CALCRIM No. 1151. The trial court instructed the jury as follows:

"The defendant is charged in Count [3, 6, 9, 10, 11, 12, 13, 14, 15, 16, 17], and [18] with pandering, in violation of Penal Code Section 266i.

"To prove that the defendant is guilty of pandering, the People must prove that:

---

[22] *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

[23] *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].

34

"1.  The defendant successfully persuaded/procured a Jane Doe to become a prostitute, or the defendant used promises or any device or scheme to cause, persuade, encourage, induce a Jane Doe to become a prostitute, or the defendant used fraud or trickery to persuade/procure a Jane Doe . . . to be a prostitute; and,

"2.  The defendant intended to influence a Jane Doe to be a prostitute.

"It does not matter whether a Jane Doe was a prostitute already.

"A prostitute is a person who engages in sexual intercourse or any lewd act with another person in exchange for money.  Pandering requires that an intended act of prostitution be with someone other than the defendant.  A lewd act means physical contact of the genitals, buttocks, or female breast of either the prostitute or customer with some part of the other person's body for the purpose of sexual arousal and gratification."

The trial court instructed the jury with the foregoing language after an extended discussion with counsel regarding the proposed instruction submitted by the prosecution. No objection or request for clarification or modification of this language was made by the defense.

### 4.2.2  *Analysis*

Defendant identifies two instructional errors regarding the CALCRIM No. 1151 instruction given to the jury in this case.  First, he argues that the instruction eliminated an essential element of the crime of pandering.  Second, he argues the instruction erroneously advised the jury that, "It does not matter whether a Jane Doe was a prostitute already."  We reject these contentions.

The People preliminarily argue that defendant has forfeited his claims of instructional error.  Generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court. (See *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.)  However, this rule does not apply if the instruction was an incorrect statement of the law.  (*Id.* at p. 1012.)  Here, defendant's position is that the challenged instruction, as given, was not a correct

statement of the law.  Thus, while defendant did not object in the trial court, we will review his claims of instructional error on the merits.

We reject defendant's initial contention that the CALCRIM No. 1151 instruction given to the jury eliminated an essential element of the crime of pandering because it allowed the jury to convict him of pandering based on a finding that he "persuaded/procured a Jane Doe to become a prostitute," without the additional finding that he did so by promises, threats, violence, or by any device or scheme, as required by subdivision (a)(2) of section 266i.  According to defendant, the trial court's instruction misstated the crime codified in section 266i, subdivision (a)(1) by "conflat[ing] pandering by 'procuring' with pandering by 'persuasion' and allow[ed] the jury to find pandering by persuasion without finding the means of persuasion required by subdivision (a)(2)."  We disagree.

As previously indicated, subdivision (a) of section 266i has six subparts that " 'define the different circumstances under which the crime of pandering may be committed.' " (*Leonard, supra*, 228 Cal.App.4th at p. 490.)  The commission of any one of the acts described in subdivision (a) constitutes the offense of pandering.  (*People v. Charles, supra*, 218 Cal.App.2d at p. 816.)  The statutory subparts or alternatives are not mutually exclusive, i.e., the subparts can be violated at the same time.  (See *Montgomery, supra*, 47 Cal.App.2d at pp. 12, 24, 27-28; see also *People v. Lax, supra*, 20 Cal.App.3d at p. 486.)

The jury in this case was instructed on three alternative theories of pandering liability under section 266i, subdivision (a)(1), (a)(2), and (a)(5).  As relevant here, the jury was told that in order to convict defendant of the crime of pandering, the prosecution had to prove, among other things, that he:  (1) "successfully persuaded/procured a Jane Doe to become a prostitute"; *or* (2) "used promises or any device or scheme to cause, persuade, encourage, induce a Jane Doe to become a prostitute."  Contrary to defendant's contention, the first alternative, which pertains to criminal liability under section 266i,

36

subdivision (a)(1), did not eliminate an essential element of the offense by allowing the jury to convict him on a theory of pandering by persuasion without a finding that he "used promises or any device or scheme" to persuade a Jane Doe to become a prostitute. As a panel of this court recently explained, to establish a violation of section 266i, subdivision (a)(1), the prosecution need not prove the additional element of the second alternative (i.e., " 'promises, threats, violence, or any device or scheme' "), which pertains to criminal liability under section 266i, subdivision (a)(2). (*People v. Chatman* (2019) 30 Cal.App.5th 989, 994 (*Chatman*).)

To the extent defendant's claim of error rests on the premise that the term "procure" as used in the pandering statute cannot be construed to mean "persuade" another person to become a prostitute, we find that it lacks merit. Again, we point out that longstanding case law has construed the term "procure" in the context of the pandering statute to mean assisting, inducing, *persuading* or encouraging a person to engage in prostitution. (*Montgomery, supra*, 47 Cal.App.2d at p. 12 [noting that the "alternatives recited in the statute are plainly not all mutually exclusive of each other"]; *Schultz, supra*, 238 Cal.App.2d at p. 812.) Such a construction is consistent with the purpose and intent of the pandering statute, which our Supreme Court has explained is to criminalize the knowing and purposeful conduct of any person seeking to persuade, encourage, or otherwise influence the target to become a prostitute. (*Zambia, supra*, 51 Cal.4th at p. 980; see *id*. at p. 973 [the statute is meant to " ' "cover all the various ramifications of the social evil of pandering and include them all in the definition of the crime" ' "; the Legislature sought to "prevent prostitution 'by discouraging persons other than the prostitute from augmenting and expanding a prostitute's operation, or increasing the supply of available prostitutes' "].) Moreover, as noted, the Legislature's numerous amendments to the pandering statute since *Montgomery* and *Schultz*, without altering the judicial construction of the term "procure," gives rise to the presumption that the

37

Legislature has acquiesced in and ratified the judicial interpretation of the statute. (*Zambia*, at pp. 975-976.)

We also reject defendant's contention that the trial court erroneously instructed the jury with the following language of CALCRIM No. 1151: "It does not matter whether a Jane Doe was a prostitute already." In *Zambia,* our Supreme Court concluded that each of the six subparts of section 266i, subdivision (a) apply when the victim is already an active prostitute, explaining that the plain intent and purpose behind all the subparts of the pandering statute is to "deter pimps or others from establishing new working relationships in the unlawful prostitution trade." (*Zambia, supra*, 51 Cal.4th at pp. 977-978; see *Chatman, supra*, 30 Cal.App.5th at p. 996 ["The caveat the court gave the jurors correctly emphasized that the fact [Jane Doe] was already a prostitute did not matter."].)

### 4.3    *CALCRIM Nos. 316, 375, and 852*

Defendant contends the trial court prejudicially erred in instructing the jury, pursuant to CALCRIM Nos. 316, 375, and 852, that evidence of his prior acts of domestic violence could be considered in assessing the credibility of his testimony.[24] We disagree.

#### 4.3.1   *Additional Background*

The amended information charged defendant with three counts of human trafficking in violation of section 236.1, subdivision (b). Each of these counts, which involved JD1, JD2, and JD3, alleged that defendant unlawfully and knowingly violated the personal liberty of the identified Jane Doe with the intent to effect or maintain a violation of section 266h (pimping) and section 266i (pandering).

In relevant part, section 236.1, subdivision (b) provides: "A person who deprives or violates the personal liberty of another with the intent to effect or maintain a violation

---

[24] Defendant notes that he would have raised additional challenges to CALCRIM Nos. 852 and 375 if the jury did not acquit him on the human trafficking counts.

of Section . . . 266h [or] 266i . . . is guilty of human trafficking . . . ." " 'Deprivation or violation of the personal liberty of another' includes substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out." (§ 236.1, subd. (h)(3).)

Prior to trial, the prosecutor filed a motion pursuant to Evidence Code sections 1101 and 1109 requesting permission to admit evidence of defendant's prior acts of domestic violence involving three of his former girlfriends for the purpose of proving his character for violence and his criminal intent with respect to the human trafficking offenses. The trial court ruled that the prior acts evidence was admissible for these purposes. There was no discussion as to whether the prior acts evidence would be admissible as impeachment evidence if defendant testified.

At the close of trial, the jury was instructed pursuant to CALCRIM No. 375 (Evidence of Uncharged Offense to Prove Identity, Intent, Common Plan, etc.)[25] and

---

[25] The trial court instructed the jury with CALCRIM No. 375, in part, as follows: "The People presented evidence that the defendant committed other offenses and other behavior not charged in this case. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged acts. [¶] . . . [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offenses or acts you may, but are not required to, consider that evidence for the limited purpose of deciding whether: [¶] The defendant acted with the intent to use force, fear, coercion, duress, menace, or threat of unlawful injury to the victim or another party in depriving or violating another's personal liberty in Count 1, Count 4, and/or Count 7 (Human Trafficking). [¶] In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and acts and the charged offenses. [¶] Do not consider this evidence for any other purpose, except for the limited purpose of determining the defendant's credibility as a witness. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶] If

39

CALCRIM No. 852 (Evidence of Uncharged Domestic Violence).[26]  The jury was instructed that it could consider the uncharged acts of domestic violence in deciding whether defendant acted with the requisite intent for the human trafficking offenses and in assessing his credibility as a witness.  The jury was also instructed with CALCRIM No. 316 (Additional Instructions on Witness Credibility—Other Conduct), which as given here stated, in relevant part:  "If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness'[s] testimony.  The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness'[s] credibility.  It is up to you to decide the weight of the fact and whether that fact makes the witness less believable."

---

you conclude that the defendant committed the uncharged offenses or acts, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of human trafficking. . . ."

[26]  This instruction is currently numbered CALCRIM No. 852A.  The trial court instructed the jury with this instruction, in part, as follows:  "The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically against [F.G.], [J.B.], and [Y.A.]  [¶]  . . .  [¶]  You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence.  . . .  [¶]  If the People have not met this burden of proof, you must disregard this evidence entirely.  [¶]  If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit domestic violence and did commit domestic violence as it relates to the elements of human trafficking for Jane Doe 1 in Count 1 and Jane Doe 2 in Count 4 in this case.  If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of any domestic violence as it relates to human trafficking.  The People must still prove each charge beyond a reasonable doubt.  [¶]  This evidence is to only be considered for this limited purpose as well as determining the defendant's credibility as a witness in this case."

40

As previously indicated, the jury found defendant guilty on 11 counts of pandering involving JD1 through JD11 and three counts of pimping involving JD1, JD2, and JD3. He was found not guilty on the pandering count involving JD12 and the human trafficking counts involving JD1, JD2, and JD3.

### 4.3.2 *Analysis*

As a general rule, failure to object to an instruction forfeits the issue on appeal. (*People v. Rivera* (1984) 162 Cal.App.3d 141, 146.) An exception to the rule of forfeiture arises, however, if the instruction affected the substantial rights of defendant. (§ 1259; *Rivera*, at p. 146.) Defendant's substantial rights are affected if the instruction results in a miscarriage of justice, making it reasonably probable that absent the erroneous instruction defendant would have obtained a more favorable result. (*Rivera*, at p. 146.; see Cal. Const., art. VI, § 13; *Watson, supra*, 46 Cal.2d at p. 836.)

We agree with the People that defendant has forfeited his claim of instructional error by failing to object. At no point did defendant object in the trial court on the ground that the challenged instructions were improper because the prior uncharged acts of domestic violence did not amount to conduct involving moral turpitude, and therefore the acts could not be used in evaluating his credibility. Had defendant objected, the trial court could have made an explicit determination as to whether the prior uncharged acts could be considered by the jury to assess his credibility as a witness. That determination is a legal question that turns on whether the prior uncharged acts involved moral turpitude. (See *People v. Wheeler* (1992) 4 Cal.4th 284, 296-297; *id*. at p. 297, fn. 7 [a witness's prior conduct involving moral turpitude is admissible to impeach his or her credibility "whether or not it produced any conviction, felony or misdemeanor"]; *People v. Rodriguez* (1992) 5 Cal.App.4th 1398, 1402 [domestic violence under § 273.5 involves moral turpitude and admissible for impeachment purposes]; *People v. Gray* (2007) 158 Cal.App.4th 635, 640 [whether conduct involves moral turpitude is a legal question for the trial court to decide].)

41

In any event, even assuming instructional error as defendant claims, we conclude the error did not result in a miscarriage of justice. Since defendant was acquitted on the human trafficking charges, we limit our prejudice inquiry to defendant's convictions for pimping and pandering. As relevant here, the jury was instructed that it *could* consider the prior uncharged acts of domestic violence if it found, by a preponderance of the evidence, that defendant committed those acts. Furthermore, the jury was told that it *could*, but was not required to, consider the uncharged acts evidence for the limited purpose of determining defendant's credibility as a witness. (CALCRIM Nos. 316, 375, 852.) The jury was further instructed that it alone must judge the credibility of witnesses using common sense and experience, (CALCRIM No. 226 [Witnesses]) and that defendant's commission of other misconduct (i.e., the prior uncharged acts of domestic violence) does not necessarily destroy or impair his credibility, and it was for the jury to decide the weight to be given to the evidence and whether it made defendant less believable. (CALCRIM No. 316.)

More importantly, the evidence presented at trial as to defendant's guilt on the pimping and pandering convictions was strong in comparison to the evidence presented by the defense, which consisted only of defendant's testimony. As discussed above, JD1, JD2, and JD3 testified in detail about defendant's conduct in assisting and encouraging them to engage in prostitution activities (e.g., posting online advertisements, setting up dates with clients, booking hotel rooms, providing transportation to dates) in exchange for a share of their earnings. These witnesses collectively testified that JD4 through JD11 also "worked" with defendant, and that the work the women engaged in was prostitution activities. The testimony of JD1, JD2, and JD3 was corroborated by the sting operation, defendant's testimony, evidence obtained from electronic searches (including cell phones), and evidence found on defendant's person and in his car. When defendant testified, he admitted that he worked with some of the Jane Does, which included posting advertisements on a Web site commonly used to advertise for prostitution activities (i.e.,

42

Backpage.com), but claimed that he did not assist or encourage any of the women to engage in prostitution activities. Instead, he maintained that he assisted the women in providing services which did not involve the exchange of sexual acts for money (e.g., modeling, body massage, dancing). He claimed that he did not know exactly what the women did for the money they earned, and that he only collected money for advertisement costs, car expenses, and hotel rooms. However, he admitted that he knew JD1 was experienced in the "industry," and did not deny that he sent her text messages showing that he knew she was engaging in sexual acts with "clients." On this record, the jury reasonably rejected defendant's denial that his relationship with the Jane Does did not include his assistance and encouragement in their prostitution activities in exchange for a portion of their earnings. Considering the instructions as a whole and the evidence presented at trial, we conclude it is not reasonably probable defendant would have obtained a more favorable result absent the alleged instructional errors.

### 4.4 *Alleged Failure to Instruct on Lesser Included Offenses*

Defendant contends the trial court prejudicially erred in failing to instruct the jury on aiding and abetting prostitution, as a lesser included offense of pandering. Defendant further contends the trial court prejudicially erred in failing to instruct the jury on attempted pandering, as a lesser included offense of pandering. In support of his claims, defendant relies on the accusatory pleading test. We find no instructional error.

#### 4.4.1 *Applicable Legal Principles*

"A criminal defendant has a constitutional right to have the jury determine every material issue presented by the evidence, and an erroneous failure to instruct on a lesser included offense constitutes a denial of that right. To protect this right and the broader interest of safeguarding the jury's function of ascertaining the truth, a trial court must instruct on an uncharged offense that is less serious than, and included in, a charged greater offense, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged greater offense are

43

present. [Citations.] [¶] But this does not mean that the trial court must instruct sua sponte on the panoply of all possible lesser included offenses. Rather, . . . ' "such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." ' [Citation.] The classic formulation of this rule is . . . : 'When there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of a lesser included offense, the court must instruct upon the lesser included offense, and must allow the jury to return the lesser conviction, even if not requested to do so.' " (*People v. Huggins* (2006) 38 Cal.4th 175, 215.) Substantial evidence is evidence that a reasonable jury could find persuasive. (*People v. Williams* (2015) 61 Cal.4th 1244, 1263.)

In determining whether a trial court must instruct on a lesser included offense, " 'a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser. [Citations.]' " (*People v. Smith* (2013) 57 Cal.4th 232, 240.)

We review the trial court's failure to instruct on a lesser included offense de novo, considering the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.) The erroneous failure to instruct sua sponte on a lesser included offense in a noncapital case is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome. In other words, we apply the *Watson* standard of prejudice. (*People v. Breverman* (1998) 19 Cal.4th 142, 165.)

### 4.4.2 *Aiding and Abetting Prostitution*

We conclude the trial court had no duty to sua sponte instruct the jury on aiding and abetting prostitution, as a lesser included offense of pandering. As an initial matter, defendant offers no authority recognizing the existence of such a crime. (See *People v. Gibson* (2001) 90 Cal.App.4th 371, 385 [noting that "there is no crime of aiding and abetting prostitution"] (*Gibson*).) But even if such a crime exists, defendant was not entitled to an instruction on this offense because, even assuming it is a lesser included offense of pandering by procurement under the accusatory pleading test as defendant claims, (cf. *Mathis, supra*, 173 Cal.App.3d at p. 1256, fn. 7 [concluding that aiding and abetting an act of prostitution is not a lesser included offense of pandering]), there is no substantial evidence that he was guilty only of aiding and abetting prostitution and not pandering.

Defendant was charged with 12 counts of pandering by procuring in violation of section 266i, subdivision (a). Each count alleged that he unlawfully procured the specified Jane Doe for the purpose of prostitution. Section 266i, subdivision (a)(1), criminalizes the "[p]rocur[ing of] another person for the purpose of prostitution." As we have previously described, the term "procure" has been construed to mean "assisting, inducing, persuading or encouraging" a person to engage in prostitution. (*Schultz, supra*, 238 Cal.App.2d at p. 812; *Montgomery*, *supra*, 47 Cal.App.2d at p. 12.) Pandering is a specific intent crime. To be guilty of the offense, the defendant must have the specific intent to persuade, encourage or otherwise influence the target to become a prostitute. (*Zambia, supra*, 51 Cal.4th at p. 980.)

In connection with prohibiting prostitution as a form of disorderly conduct, section 647, former subdivision (b)(1) states: "An individual who solicits, or who agrees to engage in, or who engages in, any act of prostitution with the intent to receive compensation, money, or anything of value from another person. An individual agrees to engage in an act of prostitution when, with specific intent to so engage, he or she

manifests an acceptance of an offer or solicitation by another person to so engage, regardless of whether the offer or solicitation was made by a person who also possessed the specific intent to engage in an act of prostitution." (Stats. 2016, ch. 734, § 1.4.)

A person is liable as an aider and abettor when (1) with knowledge of the unlawful purpose of the perpetrator and (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, that person (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime. (*People v. Beeman* (1984) 35 Cal.3d 547, 560-561.)

Here, defendant has failed to demonstrate that he is guilty only of what he claims is a lesser offense of pandering. He has not shown how a reasonable jury could have concluded that the alleged lesser offense of aiding and abetting prostitution, but not the greater offense of pandering, was committed. The evidence presented by the prosecution, if credited by the jury, showed that he knowingly assisted and encouraged the Jane Does in this case to engage in prostitution activities in exchange for a share of their earnings. The only possible offenses he committed were that of pimping and pandering. Accordingly, we find no instructional error.

Generally, the court need not instruct on a lesser included offense when, as here, the defendant completely denies the charged offense, and no evidence reasonably supports the inference that the defendant committed only the lesser included offense. (*People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1019-1020.) Defendant testified that the online advertisements he posted for the women involved in this case were not for prostitution activities. Rather, the advertisements he posted were for services that did not involve sexual acts (e.g., modeling, dancing, massages). He insisted that he never encouraged the women to engage in prostitution activities with clients and claimed that he did not know exactly what the women did with clients for the money they received. He also claimed that he collected money from the women only to pay for online advertising and other costs associated with their working relationship. In other words,

46

defendant claimed he had no knowledge that the Jane Does were engaging in prostitution activities and did not take a portion of their earnings from such activities. If the jury credited his version of events, it would have returned not guilty verdicts. An instruction on a lesser included offense is not required "when the evidence shows that the defendant is either guilty of the crime charged or not guilty of any crime." (*People v. Barton* (1995) 12 Cal.4th 186, 196, fn. 5.)

### 4.4.3 *Attempted Pandering*

We also reject defendant's contention that the trial court erred by failing sua sponte to instruct the jury on attempted pandering, as a lesser included offense of pandering. As discussed, the prosecution's evidence, if believed, established completed acts of pandering. If the prosecution's witnesses were not believed, the resulting verdict would have been an acquittal. Based on the evidence presented, defendant was "either guilty of the crime charged or not guilty of any crime," and no instruction on the lesser included attempt offenses was required. (*People v. Barton, supra*, 12 Cal.4th at p. 196, fn. 5.)

Contrary to defendant's contention, an instruction on attempted pandering was not required because there was no evidence the nontestifying Jane Does (i.e., JD4 through JD11) engaged in any act of prostitution. (*People v. Osuna, supra*, 251 Cal.App.2d at p. 531 [the crime of pandering does not require that actual acts of prostitution take place].) Nor was such an instruction required because JD4 was a fictitious or imaginary target. There was no substantial evidence to support such a finding. Both defendant and JD1 recognized JD4 when they were shown a picture of her. While defendant did not believe that he posted any advertisements for JD4, the prosecution presented evidence showing that he posted two advertisements for her on Backpage.com.

## 5.0 Ineffective Assistance of Counsel

Defendant contends his trial counsel rendered ineffective assistance by failing to object to certain testimony based on lack of foundation and hearsay. We disagree.

47

5.1     *Applicable Legal Principles*

" 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.]  Second, he must also show prejudice flowing from counsel's performance or lack thereof.  [Citation.]  Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Citations.]' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833.)

"Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.]  Defendant's burden is difficult to carry on direct appeal, as [our Supreme Court] ha[s] observed: ' "Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission." ' " (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.)  "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

The decision whether to object to inadmissible evidence is a tactical one and is accorded substantial deference on appeal.  (*People v. Riel* (2000) 22 Cal.4th 1153, 1185.) " '[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings.' " (*Id.* at p. 1197.)  "An attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel." (*People v. Kelly* (1992) 1 Cal.4th 495, 540; see *People v.*

*Wharton* (1991) 53 Cal.3d 522, 567 [" 'a mere failure to object to evidence . . . seldom establishes counsel's incompetence' "].) "In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926; see *People v. Fosselman* (1983) 33 Cal.3d 572, 581 [on appeal, a conviction will be reversed on the ground of ineffective assistance of counsel "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission"].)

    5.2    *Analysis*

As previously indicated, JD1, JD2, and JD3 were the only alleged victims that testified at trial. There was no testimony elicited from JD4 through JD12. According to defendant, trial counsel was ineffective for failing to object when JD1, JD2, and JD3 testified that certain Jane Does (JD5, JD6, JD8, JD9, & JD10) worked with defendant and engaged in sexual acts in exchange for money. Defendant argues that trial counsel should have objected on the ground that these witnesses lacked personal knowledge to give such testimony, as there was no reason to believe that they observed any other Jane Doe receive money in exchange for sexual acts. Defendant further argues that trial counsel should have made a hearsay objection when JD1 testified that JD8 told her not to tell defendant she had earned $300 from a client, which, according to defendant, "established that JD8 actually received money from a client and it implied that she owed some or all of it to [him]." Defendant maintains that, but for trial counsel's unprofessional errors, there was a reasonable probability that he would have been acquitted on the pandering convictions involving the nontestifying Jane Does (i.e., JD4

49

through JD11),[27] because the other evidence presented at trial did not establish that any of these women was an actual prostitute who engaged in prostitution.

We conclude defendant has failed to establish ineffective assistance of counsel. Defendant has not carried his burden to show deficient performance. He has failed to demonstrate that the unasserted evidentiary objections would have been sustained. Defense counsel cannot be considered ineffective for failing to make groundless objections. (*People v. Boyette* (2002) 29 Cal.4th 381, 437.) But even assuming the unasserted objections had merit, there is no affirmative explanation in the record for counsel's failure to object to the challenged testimony, and defendant has made no effort to meet his burden to show there is no satisfactory explanation for counsel's inaction. Competent counsel may forgo even a valid objection for tactical reasons. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1210, abrogated on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190-1191.) For example, defense counsel may forgo an objection to avoid highlighting testimony to the jury (*People v. Wharton, supra,* 53 Cal.3d at p. 567), or to avoid causing a prosecutor to establish a more compelling foundation for the admission of the contested testimony (*People v. Dennis* (1998) 17 Cal.4th 468, 532).

We can conceive of more than one strategic reason for trial counsel's failure to object to the challenged testimony. Counsel may have concluded that JD1, JD2, and JD3 had additional personal knowledge about the other Jane Does working with defendant and did not want the prosecutor to elicit that information. Under the circumstances, competent counsel could have determined that the risk of hearing more details relating to

---

[27] We note that defendant references the pandering convictions related to the nontestifying Jane Does (i.e., JD4 through JD11). However, he did not point to any testimony relating to JD4 or JD7 to which trial counsel was ineffective for failing to object.

how they knew the other women engaged in prostitution activities was not worth the reward of a successful objection. Alternatively, had the court sustained objections to the challenged testimony, the prosecution could have sought to introduce additional evidence, including testimony from the other Jane Does. Competent counsel could have concluded that the testimony given by JD1, JD2, and JD3 was preferable to the prosecution calling the other Jane Does to testify or the prosecutor presenting other evidence showing the prostitution activities of the Jane Does.

In addition to failing to show deficient performance, defendant has failed to carry his burden to demonstrate that he suffered prejudice as a result of trial counsel's failure to object. There was independent evidence showing that defendant worked with the Jane Does implicated by his ineffective assistance claim. There was also strong evidence supporting the conclusion that the women he worked with engaged in prostitution activities, and that he received a share of their earnings in return for his assistance in helping them engage in those activities, including posting advertisements, setting up dates, booking hotels, and providing transportation. In other words, there is ample independent evidence in the record supporting his pandering convictions with respect to JD4 through JD11.

**6.0 Multiple Pimping Convictions**

Defendant contends that he was improperly convicted and sentenced on multiple counts of pimping. Relying primarily on *People v. Lewis* (1978) 77 Cal.App.3d 455 (*Lewis*), he argues that two of his pimping convictions must be reversed "[b]ecause all three counts occurred within the same time period . . . during which [he] was continuously engaged in the unlawful profession of 'pimping,' only one conviction for pimping was supported." We disagree.

"In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct." (*People v. Reed* (2006) 38 Cal.4th 1224, 1226.) But a person may not be subject to multiple convictions for the

51

same crime arising out of a single course of conduct. (*Lewis, supra*, 77 Cal.App.3d at p. 461.) In *Lewis*, the defendant was convicted of four separate counts of pimping in violation of section 266h. (*Lewis*, at p. 457.) Each count involved the same woman and differed only as to the date of the charged transaction. (*Id.* at pp. 457-459.) The Court of Appeal held that the defendant had been improperly convicted on multiple counts for only one criminal offense arising out of "one continuous criminal act," i.e., deriving support from a prostitute's earnings over a five-year period. (*Id.* at pp. 461-462; see *People v. Garcia* (2003) 107 Cal.App.4th 1159, 1162, fn. 1, 1163 [crime of " 'flee[ing] or attempt[ing] to elude a pursuing peace officer' " violated only once by "an uninterrupted single course of conduct, i.e., one continuous act of driving lasting 30 minutes" because the statute "contemplates a continuous course of driving, which may transpire over a short or long period of time"].)

Defendant's reliance on *Lewis* is misplaced. Here, in contrast to *Lewis*, defendant was charged and convicted of three counts of pimping involving three different victims. He was subjected to multiple convictions for multiple criminal acts. The pimping counts charged distinct crimes—courses of conduct involving JD1, JD2, and JD3—which did not constitute a single course of conduct. Defendant, for his part, cites no authority for the proposition that a defendant cannot be convicted of multiple counts of pimping involving separate and distinct victims. Indeed, because each victim harmed by defendant's criminal act of pimping represents a separate injury the pimping statute was designed to prevent, defendant was properly convicted of three counts of pimping. (See *Hashimoto, supra*, 54 Cal.App.3d at p. 867 [the pimping statute is "designed to discourage prostitution by discouraging persons other than the prostitute from augmenting and expanding a prostitute's operation, or increasing the supply of available prostitutes"].)

52

## DISPOSITION

The judgment is affirmed.

          /s/
          BUTZ, Acting P. J.

We concur:

  /s/
MURRAY, J.

  /s/
RENNER, J.